**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TAKIYAH ORLENA,**<br>**Plaintiff,**<br><br>**v.**<br>**KENVUE BRANDS LLC and KELLY SERVICES, INC.,**<br><br>**Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO. 24-6575** |

## MEMORANDUM OPINION

Plaintiff Takiyah Orlena worked for months in a temporary position with Defendant Kenvue Brands LLC ("Kenvue"), a consumer health company that produces and sells over-the-counter healthcare products. Kenvue offered to convert her position into a full-time role, but it later withdrew the offer after Orlena—who lives with back pain—failed to satisfy a pre-placement health evaluation from which Kenvue concluded that her disability could not be accommodated. Orlena brings claims for disability discrimination, failure to accommodate, and retaliation pursuant to the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. § 951 *et seq.* Pursuant to Federal Rule of Civil Procedure 56, Kenvue now moves for summary judgment. For the reasons below, its motion will be granted.[1]

[1] Orlena separately moved pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), to exclude the expert report and testimony of Stephen J. Scherf, who calculated the economic damages, if any, suffered by Orlena. Because Orlena's damages are not pertinent to the motion for summary judgment, which will be granted, the *Daubert* motion will be denied as moot.

## I. FACTUAL BACKGROUND

### A. Orlena's Medical History

The following facts are not in dispute. For the past few years, Orlena has regularly received medical treatment at the Center for Interventional Pain and Spine ("CIPS") to manage ailments stemming from back surgery she underwent following a car accident. Her condition often cause her throbbing, burning, and sharp pain for most of her waking day. CIPS providers prescribed opioids and gave her epidurals to manage her pain.

### B. The Manufacturing Associate Role

While in treatment, Orlena got a job with Kelly Services, Inc. ("Kelly Services"), a temporary staffing agency, which placed her at Kenvue's plant in Fort Washington, Pennsylvania, to work as a Manufacturing Associate ("MA"). As an MA, she was responsible for manufacturing work in the plant's "processing section." As such, she rotated through various work "areas," including the "chem-weigh" area, where part of the job required carrying batches of containers, some weighing up to forty pounds, many times during each shift. The parties agree that the job is physically demanding. The job description for the MA role states that employees "must be able to meet the physical demands" of the job, which it specifically describes as "continuous lifting and/or moving from 5 to 25 lbs. weight material, and frequent lifting or moving average (25-50 lbs) weight material." Another requirement for the role, is an alternating shift schedule—implemented due to high demand for Kenvue's products—which requires MAs to work forty-eight hours every other week. The official MA job description affirms that "[r]easonable accommodations may be made to enable individuals with disabilities to perform the essential functions."

### C. Orlena's Medical Assessments

A few months into her temporary assignment, Orlena participated in Kenvue's medical

assessment program, which had two components: a physical examination and paperwork concerning the job's physical requirements. On the "Assessment Details Report and Ergonomic Questionnaire" form, Orlena represented that she (1) experienced "muscle or skeletal pain or discomfort while at work"; (2) experienced pain at a level of seven out of ten; (3) had an impairment limiting her ability to "bend, twist, or to lift/carry heavy objects"; and, (4) had an impairment that "might" prevent her from working overtime. She further noted that her temporary MA position required lifting objects between thirty and thirty-five pounds daily. Orlena's responses prompted concerns about whether she could safely perform the physical requirements of the job. Accordingly, Kenvue instructed Orlena to obtain a physical assessment clearing her for work. Despite repeated reminders—in April, May, June, August, and November—Orlena did not do so.

Nevertheless, Kenvue offered her—contingent upon completion of a health evaluation—a full-time MA position, which she accepted. As part of the hiring process, about six months after she had filled out her first medical questionnaire for Kenvue, Orlena filled out another one. This time she gave a completely different story about her health: she represented that she (1) experienced no "muscle or skeletal pain or discomfort while at work"; (2) otherwise experienced no pain; (3) did not have an impairment limiting her ability "bend, twist, or to lift/carry heavy objects"; (4) did not have an impairment that "might" prevent her from working overtime; and, (5) had not been treated by a healthcare professional in the past year. She reaffirmed, however, that her job required lifting thirty-five pounds daily.

Shortly thereafter, she met with Kenvue's occupational health doctor, Andrew Badulak, to discuss her responses and medical history. In that consultation, Orlena reported "she has a medical history of chronic pain" and "confirmed what was previously recorded" in her first

questionnaire. Badulak told Orlena that she could not return to work absent medical clearance from her treating doctor. Orlena says she and Badulak discussed the possibility of an accommodation or an assignment to a different job "if there were any issues with her health." She also asked for and received a reasonable accommodation request form but never returned a completed form to Kenvue.

Five to six weeks after her meeting with Badulak, Orlena provided Kenvue with three disability assessments. The first represented the view of two CIPS physicians, including her long-time treating doctor, and was based on an intensive, in-person evaluation of her range of motion, strength, balance, and ability. The assessment rated her as safe to occasionally lift twenty pounds, and its bottom-line conclusion was that Orlena "does not appear to meet the physical demands of the position (Frequent Lifting 25-50 lbs)." The second assessment was completed by a third CIPS-affiliated physician. This evaluation concluded that Orlena should only occasionally lift eleven to twenty pounds and should never squat or kneel. It otherwise directed the reader to the first assessment. The third assessment, completed by Orlena's nurse practitioner, corroborated the opinions of the other two. It also determined that Orlena should only occasionally lift eleven to twenty pounds, should never lift more than twenty pounds, and should not kneel. The evaluation added that Orlena should be limited to forty-hour workweeks.

### D. Kenvue Rescinds Orlena's Offer of Employment

After receiving these assessments, Kenvue's occupational health staff conveyed the results to Julieanne Sommers, a manager in the human resources department who was well-acquainted with the requirements of the MA role. The health staffs' takeaway was that Orlena could not safely perform the essential functions of the MA role, particularly lifting anything above twenty pounds. They further advised Sommers that Orlena would "require accommodations" and that "a determination needs to be made whether the candidate can be

accommodated." After discussing the matter with Orlena's manufacturing supervisor and Kenvue's legal counsel but not with Orlena herself, Sommers concluded that Orlena's lifting and work-hour limitations could not reasonably be accommodated. Sommers then made a "final decision" to terminate Orlena's temporary assignment and rescind her full-time offer. Kelly Services relayed the news to Orlena, explaining that her medical providers prescribed "alternative work requirements" that "included a lifting requirement lower than the threshold necessary" and "a[n] hourly requirement less than the client is willing to accommodate." "Due to this," Kelly Services continued, "[Kenvue] has made the difficult decision to move forward from your assignment." Although Kelly Services's message purported to be the final word on the matter, two weeks later Orlena received an email stating that she had not reported on her designated start date and, accordingly, was considered to have declined the offer of employment.

## II. LEGAL STANDARD

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law." *Bouriez v. Carnegie Mellon Univ*., 585 F.3d 765, 771 (3d Cir. 2009) (citation omitted). And an issue of material fact is "genuine," and thus warrants trial, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248-49, 252.

The moving party has the initial burden of demonstrating the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then present affirmative evidence from which a reasonable trier of fact could return a verdict in its favor. *Anderson*, 477 U.S. at 257. Summary judgment will be entered if the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. In evaluating a summary judgment motion, the facts are viewed in the light most favorable to the nonmoving party, and any reasonable inferences are made in that party's favor. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

## III. DISCUSSION

### A. Disability Discrimination and Failure to Accommodate

"The ADA and PHRA prohibit employers from discriminating 'against a qualified individual on the basis of disability.'"[2] *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 220 (3d Cir. 2024) (quoting 42 U.S.C. § 12112(a)). The ADA provides as a general rule that "[n]o [employer] shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). It also specifies that certain conduct constitutes unlawful disability discrimination. As relevant here, it provides that an employer discriminates by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can

[2] The ADA and the PHRA are "interpreted consistently and share the same standard for determination of liability." *McNelis v. Pa. Power & Light Co.*, 867 F.3d 411, 414 (3d Cir. 2017) (quotation marks and citation omitted). The statutes will be analyzed together and referred to simply as the ADA.

demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A).

In this case, Orlena claims Kenvue discriminated against her on the basis of disability because it rescinded her full-time offer after concluding (wrongly, she insists) that her disability precluded her from performing the essential functions of the MA position. Moreover, she maintains that it arrived at that determination unilaterally, without engaging in any kind of "interactive process" to work out a possible accommodation. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 311-13 (3d Cir. 1999) (explaining that a request for an accommodation—or any kind of notice that "make[s] clear that [an] employee wants assistance for his or her disability"—triggers a duty for both an employer and a disabled employee "'to assist in the search for appropriate reasonable accommodation and to act in good faith'" (quoting *Mengine v. Runyon*, 114 F.3d 415, 419-20 (3d Cir. 1997)); *see also* 29 C.F.R. Pt. 1630, App. § 1630.9 ("Once an individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the individual with a disability.").

The ADA "does not prohibit discrimination against *any individual* on the basis of disability." *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 191 (3d Cir. 2009) (emphasis in original). Rather, its protections apply to (and employers are only prohibited from discriminating against) a "qualified individual," which the Act defines as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Even where an employer has failed to engage in the interactive process, that failure is "unimportant" if an

employee is not a qualified individual under the ADA. *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 581 (3d Cir. 1998); *see also Mengine*, 114 F.3d at 420 ("'[W]here a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant.'" (quoting *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997))). Kenvue argues that Orlena has not met her burden of proving she is a "qualified individual" protected by the ADA. *See Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) ("An ADA plaintiff bears the burden of proving that she is a 'qualified individual with a disability'. . . ." (quoting 42 U.S.C. § 12111(8))).

"'A two-part test is used to determine whether someone is a qualified individual with a disability.'" *McNelis*, 867 F.3d at 415 (quoting *Gaul*, 134 F.3d at 580). First, Orlena must establish that she satisfied "the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Gaul*, 134 F.3d at 580 (quotation marks and citation omitted). Second, she must demonstrate that she could "perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.* (quotation marks and citation omitted). "The determination of whether an individual with a disability is qualified is made at the time of the employment decision." *Id.* (quotation marks and citation omitted).

Here, there is no dispute that Orlena possessed the requisite education, experience, and skill for the MA position. Instead, the question is whether she could perform the job's essential functions with or without reasonable accommodations. Kenvue's position is that Orlena could not do so without accommodation and, furthermore, could not have been reasonably accommodated. Orlena disagrees. Summary judgment will be granted only if there is no genuine dispute that Orlena could not have performed the MA role's essential functions and that

accommodations were unreasonable.

### *i. Essential Functions*

It is first necessary to determine whether there is a genuine dispute of fact regarding the essential functions of the MA role. *See Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 326 (3d Cir. 2003) (explaining that "the inquiry into whether a job requirement is essential to one's job 'is a factual determination that must be made on a case by case basis based upon all relevant evidence'" (brackets omitted) (quoting *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 148 (3d Cir. 1998) (en banc))). A job's "essential functions" are those "that are 'fundamental,' not 'marginal,'" to the position. *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 279 (3d Cir. 2001) (quoting 29 C.F.R. § 1630.2(n)(1)). As explained by the ADA's implementing regulation, a function might be essential because, among other possibilities, "the reason the position exists is to perform that function," only a "limited number of employees" can perform the function, or the function requires "highly specialized . . . expertise or ability." 29 C.F.R. § 1630.2(n)(2). Relevant evidence includes but is not limited to the employer's judgment as to which functions are essential, written job descriptions prepared before advertising or interviewing applicants for the job, the amount of time spent on the job performing the function, the consequences of not requiring the incumbent to perform the function, the terms of a collective bargaining agreement, the work experience of past incumbents in the job, and the current work experience of incumbents in similar jobs. *Id.* § 1630.2(n)(3).

In this case, Kenvue posits that two essential functions of the MA role are (1) working in the chem-weigh and mixing areas, which, in effect, consists of frequently lifting over twenty pounds; and, (2) working a forty-eight-hour workweek every other week. In her brief, Orlena stresses that the Third Circuit has "cautioned against any premature determination of what is an

essential function." *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 613 (3d Cir. 2006). Nevertheless, she concedes that MAs are required to rotate through all areas of the position, that the chem-weigh and mixing areas are the role's "main functions," and that this work requires regularly lifting more than twenty pounds. Indeed, while there are certain inconsistencies in her responses to the Assessment Details Report and Ergonomic Questionnaire, there was no change to her answer that she lifted more than thirty pounds daily. Moreover, Orlena does not contest that all MAs work forty-eight hours every other week. Thus, for purposes of summary judgment, there is no dispute over the essential functions of the MA job.

***ii. Qualified Individual***

The next question is whether there is a genuine dispute regarding whether Orlena could perform the essential functions of her job either with or without reasonable accommodations. *See id.* at 614 ("As with the issue of 'essential function,' the issue of 'reasonable accommodation' presents a fact question.").

Orlena first argues that she could have performed the essential functions *without* accommodation. For eleven months, she contends, she successfully performed all aspects of the MA role, including lifting over twenty pounds and occasionally working more than forty hours in a week. Her manufacturing supervisors regarded her as a "good worker" and even testified that she progressed faster in the role than others. In fact, she did the job so well that Kenvue offered her a full-time position. These facts, she contends, would permit a jury to find that she could fulfill the job's lifting and work-hour requirements.

Her evidence of prior performance, however, is immaterial in light of the restrictions imposed by her own medical providers. Orlena submitted to Kenvue not one but three assessments of her ability to do the job. The conclusion was unanimous that she could not safely

lift more than twenty pounds, and one also limited her workweek to forty hours. Until receiving the assessments, Kenvue had been unaware of the extent of Orlena's physical restrictions. Orlena was largely responsible for that. For months, she had neglected repeated requests to obtain medical clearance, and she finally submitted the assessments only once doing so became a condition of returning to work and securing full-time employment.

Orlena may in retrospect disagree with her physicians' assessments, but nothing in the record demonstrates that disagreement or suggests the evaluations were medically unsound. Thus, her point seems to be that she wanted to remain in the MA role against medical advice, and that the ADA compelled Kenvue to honor that decision. The ADA, however, simply "does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden." *Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003); *see also, e.g.*, *Newell v. Alden Vill. Health Facility for Child. & Young Adults*, 2014 WL 6757928, at *5 (N.D. Ill. Dec. 1, 2014) ("It is well established that the ADA does not require an employer to disregard documented, uncontroverted medical restrictions. If an employer contravened medical restrictions, it would open the employer up to separate ADA liability for failure to abide by restrictions." (citation omitted)); *Jennings v. Dow Corning Corp.*, 2013 WL 1962333, at *12 (E.D. Mich. May 10, 2013) ("[T]he ADA does not provide for a plaintiff to challenge the reasonable medical judgment an employer relies upon."); *Davis v. Heraeus Electro-Nite Co.*, 2002 WL 31969653, at *3 (E.D. Pa. Aug. 22, 2002) (holding an employer "was entitled to rely on the uncontroverted opinion of Plaintiff's own physician in determining that she could not perform the job").

To hold otherwise would create absurd results: an employer would be compelled "to hire a worker willing to accept a risk to himself from his disability," even if doing so exposed the

employer to liability under different laws. *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 85 (2002). That is not the world envisioned by Congress. "[T]he ADA recognizes that the goal of ending disability discrimination must be balanced against the health and safety risks that disabilities sometimes pose to others" or to the individual herself. *Doe v. Cnty. of Centre*, 242 F.3d 437, 447 (3d Cir. 2001). To that end, a disabled employee is unable to perform a job's essential functions when unrebutted medical assessments come to that conclusion. *See McNelis*, 867 F.3d at 418 (holding that a nuclear power plant was "entitled to rely on" a physician's determination that a veteran security officer was unfit for duty, and warning that "in the ADA context" courts "should not 'second-guess' a physician's determination that an employee failed to meet the . . . requirements of his job" (citing *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 522 (1999))). Here, *three* medical assessments—including one authored by her primary physician at CIPS—imposed lifting and work-hour restrictions incompatible with the MA role's essential functions. The evaluations therefore conclusively establish that "at the time of the employment decision," *Gaul*, 134 F.3d at 580, Orlena could not have performed the job without accommodations.

But could she have done so *with* reasonable accommodations? A "reasonable accommodation," as defined by the ADA, refers to measures such as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, . . . and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). "[T]he issue of 'reasonable accommodation' presents a fact question" requiring a plaintiff to make "a facial showing that her proposed accommodation is possible." *Turner*, 440 F.3d at 614. If that showing is made, the burden shifts to the employer "to prove, as an affirmative defense, that the accommodations requested . . . are unreasonable, or would cause

an undue hardship on the employer." *Id.* An accommodation might be unreasonable if, for example, it would require "an employer to create a new position," would "transform a temporary light duty position into a permanent position," "would pose a 'direct threat' to the safety of the employee or others," or "would conflict with seniority rules." *Id.* (quoting 29 C.F.R. § 1630.15(b)(2)).

Attempting to meet her initial burden, Orlena proposes that Kenvue could have assigned her to the mixing area, the dishwashing area, and/or the sugar area. These proposals fail to satisfy her burden for three reasons. First, Orlena's proposals only address part of the problem. She contends that the assignments would have accommodated her because they "did not involve lifting or had very infrequent lifting." While purporting to offer a solution to the lifting requirement, Orlena fails to propose any accommodation for the requirement that MAs work forty-eight hours every other week.

Second, insofar as Orlena's proposals would exempt her from lifting more than twenty pounds, they are fundamentally flawed. The ADA requires employers "to provide an accommodation so as to enable the employee to perform such a function." *See Skerski*, 257 F.3d at 285 n.4. Employers are not, however, "required to accommodate an employee by removing an essential function or restructuring a job so as to avoid it." *Id.*; *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 232 (3d Cir. 2000) ("[E]mployers are not required to modify the essential functions of a job in order to accommodate an employee."). Stated differently, "'[a]n accommodation that eliminates an essential function of a job is not reasonable.'" *Nixon v. Runyon*, 856 F. Supp. 977, 989 (E.D. Pa. 1994) (brackets omitted) (quoting *Hall v. U.S. Postal Serv., Inc.*, 857 F.2d 1073, 1078 (6th Cir. 1988)). Here, Orlena's proposals—in theory—are engineered to avoid a conceded essential function of the MA job: the lifting requirement.

Accordingly, they are not "accommodations" but rather proposals for a permanent "light duty" position that Kenvue had no obligation to create. *See Turner*, 440 F.3d at 614 ("The ADA does not require an employer to create a new position in order to accommodate an employee with a disability, or transform a temporary light duty position into a permanent position.").

Third, as a factual matter—and contrary to the premise of Orlena's proposals—her assignment to the mixing, dishwashing, or sugar areas would not even have accommodated her lifting restrictions. The record demonstrates (and Orlena agrees) that MAs working in these areas lift ingredient batches and various equipment (*e.g.*, a metallic funnel) weighing more than twenty pounds. Her proposals are therefore "'clearly ineffective'" because they would still have required her "to undertake activity that [her] own doctors had deemed 'unsafe.'" *Skerski*, 257 F.3d at 284, 286 (first quoting *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 670 (3d Cir. 1999); then quoting *Lodderhose v. Viacom Cable, Inc.*, 1998 WL 57025, at *7 (N.D. Cal. Jan. 27, 1998)).

In a final attempt to salvage her claims, Orlena proposes a fourth accommodation: transfer to an unspecified position either in the packaging or general administration departments. Where a proposed accommodation entails transferring to a different role, a plaintiff's burden is to "'demonstrate that there were vacant, funded positions whose essential duties [she] was capable of performing, with or without reasonable accommodation, and that these positions were at an equivalent level or position as [her] former job.'" *Gaul*, 134 F.3d at 580 (brackets omitted) (quoting *Shiring v. Runyon*, 90 F.3d 827, 832 (3d Cir. 1996)). Here, Orlena points to no evidence demonstrating that there were vacant positions in either of the proposed departments. Nor does she develop any argument about her capacity to perform that work. In fact, apart from showing that one task in the packaging department is to oversee the bottle-filling process, the

record reveals next to nothing about what the work in either department entails. Thus, even assuming that positions were available, it is impossible to evaluate whether Orlena was qualified for them.

In sum, Orlena does not meet her prima facie burden because her proposed accommodations are "unreasonable as a matter of law." *Gaul*, 134 F.3d at 581. Therefore, she is not a "qualified individual" under the ADA, and summary judgment will be granted to Kenvue as to the disability discrimination and failure to accommodate claims.

**B. Retaliation**

Kenvue also seeks judgment on Orlena's claims for retaliation under the ADA and the PHRA.[3] The ADA's anti-retaliation provision states in relevant part that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA]." 42 U.S.C. § 12203(a). This provision—which is nearly identical to Title VII's prohibition on retaliation, 42 U.S.C. § 2000e-3(a)—"require[s] proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013); *see also* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII] . . . ."). In other words, a plaintiff claiming unlawful retaliation under the ADA must establish that "the unlawful retaliation would not have occurred in the absence of" her ADA-protected activity. *Nassar*, 570 U.S. at 360. Causation is a question

[3] Unlike her discrimination and failure to accommodate claims, Orlena's retaliation claims do not require her establish that she is a "qualified individual." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997) ("An individual who is adjudged not to be a 'qualified individual with a disability' may still pursue a retaliation claim under the ADA.").

of fact typically reserved for the jury. *See Krouse*, 126 F.3d at 503.

Orlena contends that Kenvue rescinded her full-time offer in retaliation for discussing potential accommodations with Badulak, Kenvue's occupational health doctor. *See Steidle v. U.S. Liab. Ins. Co.*, 179 F.4th 193, 204 (3d Cir. 2026) ("The ADA prohibits 'retaliation against an employee for requesting an accommodation.'" (quoting *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188 (3d Cir. 2010))). She therefore necessarily claims that Kenvue took the adverse employment action "because" she engaged in protected activity.

Summary judgment is appropriately granted when the material facts, as characterized by the plaintiff, negate an essential element of her claim. *See, e.g.*, *Williams v. City of York*, 967 F.3d 252, 261 (3d Cir. 2020) (granting summary judgment in a Section 1983 excessive force case because the plaintiff had conceded that she could not describe each officer's "personal involvement" in the alleged violation, which was a "manifest" requirement of her claim). Here, Orlena's explanation for why Kenvue revoked her offer fatally undermines her retaliation claims. In her opposition brief, she states: "Plaintiff and Defendant are in total agreement on at least one thing – the challenged adverse decision was made against Plaintiff ***because of*** her back disability. It is clear by Defendant's admissions and statements[] that it made the decision at issue based solely upon the information that Plaintiff allegedly could not perform the essential functions of the MA position due to her restrictions" (emphasis in original). Furthermore, she represents that she "understood that her job was being revoked by Defendant due to allegedly not meeting the medical requirements" (citing her own deposition testimony) and that "Sommers made the decision to revoke Plaintiff's job offer because of Plaintiff's medical conditions" (citing Sommers's deposition). In other words, under her own view of the evidence, the cause of her adverse employment action was her inability, actual or perceived, to fulfill the job's essential

functions.

Orlena's statements satisfy the criteria for binding judicial admissions concerning the material fact of causation. *Bedrosian v. U.S. Dep't of Treasury*, 42 F.4th 174, 184 (3d Cir. 2022) (explaining that a district court "has discretion to treat a party's statement as a judicial admission and to bind the party to that admission"); *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972) ("[J]udicial admissions are binding for the purpose of the case in which the admissions are made . . . ."). The statements pertain "to matters of fact which otherwise would require evidentiary proof," *i.e.*, causation, as opposed to a "legal theory of [the] case." *Glick*, 458 F.2d at 1291. Moreover, the statements are "unequivocal"—or, stated differently, "intentional, clear, and unambiguous." *Bedrosian*, 42 F.4th at 184 (quotation marks and citation omitted). To be sure, in the context of her entire brief, Orlena appears to equivocate on the issue of causation. She maintains, for example, that Kenvue subjected her to retaliation "for" or "in response to" requesting accommodations. But even in defending her retaliation claims, she "incorporates" her earlier statements attributing Kenvue's decision to her medical limitations and explicitly reaffirms "that [her] disability was the reason for the adverse action." Ultimately, as she herself posits, her disability-related restrictions were the "sole[]" reason that her offer was revoked. In light of her "definite position," *Glick*, 458 F.2d at 1291, there can be no genuine dispute about whether retaliatory animus connected to her request for accommodations was a but-for cause of her employment decision. Kenvue is therefore entitled to summary judgment on her retaliation claims.

An appropriate order follows.

**BY THE COURT:**

**____/s/ Wendy Beetlestone________________**
**WENDY BEETLESTONE, C.J.**